UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NICHOLAS LACRUZE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-02148-JPH-KMB |
| | ) | |
| D. ZATECKY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Nicholas LaCruze sued correctional and administrative staff ("State Defendants") at Pendleton Correctional Facility alleging that they were deliberately indifferent to his conditions of confinement and used excessive force against him.

State Defendants have filed a motion for summary judgment.[1] Dkt. [97]. For the reasons below, that motion is **granted in part and denied in part**.

**I.**
**Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the

---

[1] Medical Defendants also moved for summary judgment. Dkt. 93. Their motion has been resolved by a separate order.

nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

## II.
## Surreply and Plaintiff's Notice to the Court

Mr. LaCruze filed a surreply to the State Defendants' motion for summary judgment. Dkt. 18. A surreply may be filed "only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response." Local Rule 56-1(d). A surreply "must be limited to the new evidence and objections." *Id.* The State Defendants did not cite new evidence in their reply. They do take issue with Mr. LaCruze's failure to provide detailed citations in his response brief to the over 100 pages of exhibits he attached to it. But his surreply does not address that issue. Instead, it rehashes arguments made in his response brief and argues that the State Defendants did not provide complete

responses to his discovery requests. The Court's review of the surreply reveals that it is not permitted by Local Rule 56-1(d). Accordingly, the Court did not consider plaintiff's surreply. Dkt. 118.

The Court granted the State Defendants' second motion for protective order and denied Mr. LaCruze's motion to compel. Dkt. 119. The Court also provided Mr. LaCruze an opportunity to supplement his response to the State Defendants' motion for summary judgment. *Id.* Mr. LaCruze filed a two-page notice with the Court and attached 108 pages of exhibits. The notice argues that the State Defendants have video evidence they did not produce and that the Court did not address all the discovery disputes raised in his motion to compel. Dkt. 120. He also moves to reopen discovery to allow him to obtain discovery he previously requested from the State Defendants. *Id.*

"A motion must not be contained within a brief, response, or reply to a previously filed motion, unless ordered by the court." Local Rule 7-1(a). Nevertheless, Mr. LaCruze has not shown good cause to reopen discovery. The Court previously addressed all the issues raised in his motion to compel. Dkt. 119. Thus, to the extent his notice was intended as a motion to reopen discovery, it is **denied**. Dkt. [120].

### III.
### Factual Background

Because State Defendants moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-

moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

### A. The Parties

Mr. LaCruze is an Indiana Department of Correction ("IDOC") inmate who at all relevant times was housed at Pendleton Correctional Facility ("Pendleton"). Dkt. 98-3 at 11-12.

State Defendants were all employed at Pendleton. Dushan Zatecky was the warden. Dkt. 98-2 at 1. Duane Alsip was the deputy warden. Dkt. 106-1 at 60. Jonathan Jackson was a correctional lieutenant. Dkt. 98- 5 at 1. Boyd Lunsford and Jason Griffin were correctional sergeants. Dkt. 98-7 at 1; dkt. 98-8 at 1. Eric Hammond was a correctional officer. Dkt. 98-9 at 1. Misty Stamper was a program coordinator. Dkt. 98-6 at 1. James Walker was a maintenance foreman. Dkt. 98-11 at 1.

### B. IDOC's COVID-19 Precautions

In response to the COVID-19 pandemic, on March 16, 2020, the IDOC implemented Executive Directive 20-20 which presented and authorized the IDOC's Pandemic Preparedness and Response Plan ("the Pandemic Response Plan"). Dkt. 98-1. The purpose of the Pandemic Response Plan was to manage infectious diseases in the IDOC "through a comprehensive approach which includes prevention, testing, appropriate treatment, education, and infection control measures." *Id.* The Pandemic Response Plan outlined measures such as social distancing, monitoring for infections, and isolating ill inmates. *Id.* Warden Zatecky deferred to IDOC's Chief Medical Officer Kristen Dauss's expertise

4

regarding how to handle the pandemic. Dkt. 98-2 at 1-2. Dr. Dauss recommended that inmates who had tested positive for COVID-19 should be housed together, away from other inmates. *Id.*

Several measures were taken at Pendleton to prevent the spread of the virus. Prison officials began to restrict inmate movement near the beginning of the pandemic. Dkt. 98-3 at 31-32. Inmates and staff were provided masks, although staff did not always wear them. *Id.* at 33. Daily temperature checks were implemented. *Id.* at 34.

### C. Mr. LaCruze's Exposure to COVID-19

In late March or early April 2020, at the beginning of the COVID-19 pandemic, an inmate from the American Legion dorm was transferred to Mr. LaCruze's dorm. LaCruze Deposition, dkt. 98-3 at 37-38. The inmate had a heart attack and was taken to the hospital where he tested positive for COVID-19. *Id.* Around this time, Mr. LaCruze began experiencing symptoms of COVID-19 and was placed on quarantine in an individual cell in the ROT building. *Id.* at 35-37. After Mr. LaCruze had been quarantined in an individual cell for a few days, he was moved to the F-Gym where other inmates were also being housed. The exact date of this transfer is not in the record. Mr. LaCruze testified that Officer Griffith told the inmates in the ROT building that COVID-19 positive inmates were being moved there so anyone who refused to move to the F-Gym would be exposed to

the virus. *Id.* at 42. In the interim, a team from the Indiana Department of Health would be cleaning and sanitizing the individual cells. Dkt. 98-2 at 2.

On April 14 or 15, 2020, representatives from the Indiana Health Department visited the facility and tested inmates for COVID-19, including Mr. LaCruze. *Id.* at 39-40. Medical records reflect that the test results were received on April 19, 2020, and that Mr. LaCruze had tested positive for the virus. Dkt. 98-4.

### D. The April 17, 2020, Gym Riot

On April 17, 2020, prison officials told the inmates in F-Gym to pick their belongings up from the floor because someone was coming to clean. Dkt. 98-3 at 43. A few hours later, Lt. Jackson tried to move an inmate who had tested positive for COVID-19 into the gym. *Id.* at 44-45. The inmate had recovered from the infection and had tested negative for COVID-19, but the inmates in the gym did not know this. Dkt. 98-5 at 1. The inmates began to yell that the inmate should not come into the gym before they received their COVID-19 test results. Dkt. 98-3 at 44. An inmate walked past Mr. LaCruze and said he heard that 30 inmates in the gym tested positive for the virus. *Id.* This prompted Mr. LaCruze to move toward the area of the gym where inmates were arguing with correctional officers including Ms. Stamper. He was hoping to hear from the officers whether it was true that test results for inmates housed in the gym had come back positive. *Id.*

The video of the incident shows several inmates, including Mr. LaCruze, get close to Ms. Stamper and other staff. Dkt. 104 at 10:40. Ms. Stamper told

the inmates to step back at least twice. Dkt. 98-6 at 2. She felt like they were going to attack her and was afraid for her safety. *Id.* Ms. Stamper deployed OC spray in an arc motion in the direction of the advancing inmates. *Id.*; dkt. 104 at 11:05. Some of the spray hit Mr. LaCruze. Dkt. 98-3 at 49-50. In response, he lunged toward Ms. Stamper and punched her in the face, knocking her to the wall. Dkt. 104 at 11:11. Sgt. Lunsford went to help Ms. Stamper, and several inmates began beating him until he lost consciousness. Dkt. 98- 8 at 2. Mr. LaCruze hit other officers, although he does not remember who because he blacked out when he was hit with OC spray. Dkt. 98-3 at 49-50.

After Mr. LaCruze punched Ms. Stamper, he hit another officer and was then pushed out of the view of the camera by a third officer. Thus, there is no video evidence of how officers responded to Mr. LaCruze after that point. He testified at his deposition that he was beaten to within an "inch of [his] life" and that he would not have survived if inmates had not come to his defense by throwing things at the officers. Dkt. 98-3 at 44. He was covered in blood, handcuffed with a correctional officer putting all his weight on Mr. LaCruze's neck, while other officers kicked and punched him in the face. *Id.*

The defendants ignore this sworn testimony from Mr. LaCruze and instead cite medical records that state Mr. LaCruze suffered no injuries other than a small pin prick on his left buttock. Dkt. 99 at 7, 18 (citing 98-12). Mr. LaCruze

disputed the accuracy of this medical record during his deposition. Dkt. 98-3 at 69.

Although Mr. LaCruze was not able to identify every officer that allegedly used excessive force, he testified at his deposition that Ms. Stamper tried to gouge out his eye and that defendants Jackson, Walker, and Hammond held him down while other correctional officers kicked and punched him. *Id.* at 54-58. Mr. LaCruze also testified that he had no memory of Sgt. Lunsford applying excessive force against him, but that Sgt. Lunsford was part of the team of correctional officers responding to the disturbance in the gym. *Id.* at 58-59.

Mr. LaCruze subsequently pleaded guilty in state court to assaulting defendants Stamper, Hammond, and Walker. Dkt. 98-3 at 61-63.

### E. Mr. LaCruze's Placement in the D.O. Building and Transfer to Westville

After the riot, Mr. LaCruze was moved to a dry cell where he remained handcuffed for 6-7 hours. He was not given a shower to remove the OC spray and he had no access to water or a toilet. He was then moved to a strip cell where he had access to a sink and toilet, but the water was undrinkable. Dkt. 98-3 at 45. Mr. LaCruze did not know who moved him to these cells, but it was not any of the defendants. *Id.* at 55. He was transported to Westville Correctional Facility on April 22 or 23, 2020. *Id.* at 60.

**IV.**

**Discussion**

Mr. LaCruze alleges several Eighth Amendment violations. Relevant to the claims against the State Defendants, the Court identified the following claims at screening:

- Eighth Amendment deliberate indifference claims against defendants Zatecky, Alsip, Stamper, Jackson, Griffin for knowingly exposing the plaintiff to COVID-19;

- Eighth Amendment excessive force and deliberate indifference claims against defendants Stamper, Jackson, Lunsford, Hammond, and Walker for their involvement in beating the plaintiff, spraying him with mace, and declining to provide him access to medical treatment;

- Eighth Amendment conditions of confinement and deliberate indifference claims against defendants Zatecky, Alsip, Jackson, Lunsford, and Hammond for failing to allow the plaintiff to be decontaminated after he was sprayed with mace and for failing to provide the plaintiff with access to clean water after the excessive force incident, while the plaintiff suffered with symptoms of COVID-19; and

- A State law claim against Warden Zatecky seeking indemnification.

Dkt. 12 at 4–5.

**A. COVID-19 Claims**

The Eighth Amendment imposes certain duties on prison officials, such as the duty to ensure that inmates receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations omitted). An official who fails to uphold these duties violates the Eighth Amendment upon exhibiting "deliberate indifference to a substantial risk of serious harm to an inmate." *Id.* at 828.

"A prison official cannot be found liable under the Eighth Amendment for

denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw on that inference." *Id.*

Mr. LaCruze believes that he should not have been moved from quarantining in a single-man cell to the F-Gym and that prison officials should not have brought an inmate with COVID-19 to the gym. But the evidence shows that the inmate brought to the gym had recovered from COVID-19 and tested negative for the virus before being brought to the gym. And even if a reasonable jury could find that placing Mr. LaCruze in a gym with a group of inmates who were exhibiting symptoms of COVID-19 could pose a substantial risk of harm to his health or safety, Mr. LaCruze would have to show deliberate indifference to that risk. *See Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (finding that the transmissibility of COVID-19 combined with a prison's dormitory-style housing presented a substantial risk that prisoners "will be infected with COVID-19 and have serious health effects as a result[.]").

Here, the designated evidence cannot support a finding that the defendants were deliberately indifferent to that risk. As a preliminary matter, Pendleton staff undertook efforts to prevent the spread of COVID-19 by implementing the IDOC's Pandemic Response Plan. This called for measures such as social distancing, monitoring for infections, and isolating ill inmates. Dkt. 98-1. Warden Zatecky followed guidance from the IDOC's top medical

10

advisor. Dkt. 98-2 at 1-2. This "reasonabl[e] reli[ance] on the judgment of medical personnel" does not amount to deliberate indifference. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018). Non-medical officials are presumptively "entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care." *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008).

Mr. LaCruze was moved from his dorm to a single-man cell because he was suspected of having COVID-19 due to his symptoms. Dkt. 98-3 at 37. Separating sick inmates and healthy inmates was at the recommendation of IDOC's medical director and was consistent with the Pandemic Response Plan. Dkt. 98-2 at 1-2. Mr. LaCruze was moved to the gym to allow a cleaning crew to sanitize housing areas of the prison. *Id.* The inmate whose appearance at the gym door sparked the riot had recovered from, and tested negative for, COVID-19. So, despite the beliefs of the inmates in the gym, there is no designated evidence that defendants placed a known COVID-positive patient among non-infected inmates (in fact, Mr. LaCruze was already positive for the virus when he was moved to the gym, although his test results had not yet been received). The defendants' actions show an intent to remediate the harm caused by the virus and prevent its spread, not a conscious disregard for the health risks posed by it.

The undisputed evidence is thus that Pendleton staff responded reasonably to the COVID-19 pandemic. Other federal courts to examine the issue have concluded that, because the prisons had implemented protective measures

11

like those in the IDOC's Pandemic Response Plan, plaintiffs could not show that prison officials had a reckless disregard for the inmates' safety. *See Wilson*, 961 F.3d at 841 (finding that deliberate indifference claim failed on the subjective prong because protective measures included screening, quarantining sick inmates, limiting group gatherings, screening inmates and staff, enhanced cleaning measures, and providing masks to inmates); *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020) (vacating preliminary injunction because protective measures did not show state of mind necessary for deliberate indifference); and *Swain v. Junior*, 958 F.3d 1081, 1089 (11th Cir. 2020) (same). No jury could conclude that the State Defendants' actions evinced deliberate indifference, even though Mr. LaCruze was sickened by the virus. *Farmer*, 511 U.S. at 844 (defendant "responded reasonably to the risk, even if the harm ultimately was not averted").

In support of his claim that Sgt. Griffin acted with deliberate indifference to the risk of spreading COVID-19, Mr. LaCruze testified that when Sgt. Griffin moved Mr. LaCruze from his single-man quarantine cell to the gym, Sgt. Griffin threatened him by saying that anyone staying in the one-man cells would be exposed to COVID-19 because prison officials were moving in inmates who had tested positive for the virus. Dkt. 98-3 at 42. The Seventh Circuit has held that "threats of grave violence" and "verbal abuse by guards" can constitute cruel and unusual punishment under the Eighth Amendment. *Hughes v. Farris*, 809 F.3d 330, 334 (7th Cir. 2015). But no reasonable juror could conclude that Sgt. Griffin's comments were a threat or were abusive. Sgt. Griffin did not threaten

to expose Mr. LaCruze to the virus. Instead, he informed Mr. LaCruze how the prison was housing inmates to protect them from exposure.

For these reasons, summary judgment is **granted** as to all of Mr. LaCruze's COVID-19-exposure claims. Because the Court has found as a matter of law that the defendants did not violate Mr. LaCruze's constitutional rights, the Court need not address the defendants' qualified immunity argument. *Sparing v. Village of Olympia Fields,* 266 F.3d 685, 688 (7th Cir. 2001) (the first step of a qualified immunity determination is whether the plaintiff has shown the violation of an actual constitutional right).

### B. Excessive Force During the April 17, 2020, Incident

The Court turns to Mr. LaCruze's excessive force claim as it relates to the riot in the F-gym.  Mr. LaCruze contends that Defendants used excessive force when Defendant Stamper sprayed him with OC spray and when several Defendants hit, kicked, and beat him after he was taken down to the ground.

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6−7 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 320−21 (1986)).

As the Seventh Circuit has explained,

The ultimate determination of the intent of the person applying the force in an excessive force claim involving prison security measures depends upon a number of factors, including: (1) the need for the application of force; (2) the relationship between the need and the

amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

*McCottrell v. White*, 933 F.3d 651, 663 (7th Cir. 2019) (internal citations omitted).

### 1. Sgt. Lunsford

Mr. LaCruze testified that he named Sgt. Lunsford as a defendant because he was present during the riot. Dkt. 98-3 at 58-59. Mr. LaCruze therefore has not designated evidence that Sgt. Lunsford used force against him. Moreover, while the video does not capture everything that happened to Mr. LaCruze after he punched Ms. Stamper, it does show Sgt. Lunsford lying on the ground severely injured. Thus, he could not have used any force against Mr. LaCruze. Accordingly, summary judgment is granted to Sgt. Lunsford due to lack of personal involvement.

### 2. Ms. Stamper's use of OC spray

The situation that Ms. Stamper faced presented a serious threat of harm to both staff and inmates in the F-Gym. She and the other prison employees present in the gym were outnumbered by inmates who were angry and scared about the introduction of an inmate they believed had COVID-19. As the inmates became more agitated and drew closer to Ms. Stamper, she ordered them to back away. Dkt. 98-6 at 2. When they repeatedly failed to comply, she sprayed a short burst of OC spray in their direction. *Id.*

Given the video evidence, no reasonable juror could conclude that Ms. Stamper deployed OC spray in a malicious attempt to cause harm rather than

in a good-faith attempt to restore order. *Hudson*, 503 U.S. at 6–7. Her limited use of OC spray after warning inmates to step back was a measured and reasonable response that caused minimal harm to the inmates who had not followed her orders. *See McCottrell*, 933 F.3d at 663.  Summary judgment is granted to Ms. Stamper with respect to Mr. LaCruze's claim that she used excessive force when she sprayed him with OC.

### 3.   Use of force by Defendants Stamper, Jackson, Hammond, and Walker after Mr. LaCruze assaulted officers

The parties dispute whether the amount of force used on Mr. LaCruze after he was taken down was excessive. Given the nature of the melee that broke out in the F-gym and the evidence that Mr. LaCruze physically assaulted and hit multiple prison personnel, prison personnel were unquestionably entitled to use force to subdue him and restore order. *Whitley v. Albers*, 475 U.S. 312, 321-23 (1986) ("When the 'ever-present potential for violent confrontation and conflagration,' [ ], ripens into *actual* unrest and conflict, the admonition that 'a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators,', [ ] carries special weight.")  (citations omitted and cleaned up).

The question then is whether "the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain." *Id.* at 322. In other words, whether the force was "applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6–7.  While many of the events that are

15

the subject of this case were captured on video, there is no video of much of Mr. LaCruze's encounter with the officers after he punched Ms. Stamper. So, with respect to what occurred during that timeframe, the Court must look to other designated evidence.

Mr. LaCruze contends in his verified response that after he was taken down, one officer had "their knee in the back of my neck with all his body weight on my neck," other officers kicked him "in the head & face & stomp[ed] [him] in the back," and Ms. Stamper tried to scratch his right eye out. Dkt. 116 at 18; dkt. 98-3 at 21; 54. He also has presented testimony that Defendants Walker, Jackson, and Hammond held him down while other correctional officers beat him to "within an inch" of his life. Dkt. 98-3 at 44, 54-58.[2]

Defendants Jackson and Walker admit that they helped restrain Mr. LaCruze but deny that they beat him once he was restrained or allowed other officers to do so. Dkt. 98-5; dkt. 98-11. Defendant Hammond attests that he only used the force necessary to subdue inmates who were attacking him and other officers. Dkt. 98-9. He also denies that he used force on any restrained inmate. *Id.* Defendant Stamper contends that she did not "kick, punch, or attempt to

---

[2] Defendants may be liable under § 1983 for failing to take reasonable steps to stop the use of excessive force by fellow officers. *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) (allowing failure to intervene theory to proceed in excessive force case despite not being explicitly pled in the complaint; although "a plaintiff must establish a defendant's personal responsibility for any claimed deprivation of a constitutional right, a defendant's direct participation in the deprivation is not required"). Here, a reasonable juror crediting Mr. LaCruze's version of events, could conclude that these Defendants participated in the use of excessive force against him by holding him down while other officers beat him.

scratch or gouge [Mr.] LaCruze's eyes," and that she did not "lay a finger on him" once he was restrained.  Dkt. 98-6 at 2.

Whether by design or neglect, Defendants do not acknowledge or confront Mr. LaCruze's evidence, instead arguing that they are entitled to summary judgment because Mr. LaCruze failed "to offer admissible evidence that he was beaten by any of the Defendants."  Dkt. 117 at 3.  The conflicting testimony creates material disputes of fact that preclude summary judgment in their favor.[3] To prevail at a jury trial, Mr. LaCruze will have to convince a jury that the officers acted for the purpose of harming him, and not in a good faith effort to restore security.  *Whitley*, 475 U.S. at 320-21; Federal Civil Jury Instructions of the Seventh Circuit,  Pattern Instruction No. 7.18.  But given the conflicting material facts, those factual determinations need to be made by a jury.

Summary judgment is therefore denied on Mr. LaCruze's claim that defendants Stamper, Jackson, Walker, and Hammond used excessive force after he was taken down.

---

[3] Had Defendants confronted Mr. LaCruze's testimony, perhaps they could have demonstrated that their actions were reasonable as a matter of law under the standards set forth in *Whitley*, 475 U.S. at 320−21, and *McCottrell*, 933 F.3d at 663. Officers have substantial latitude in determining the amount of force needed in dangerous and rapidly evolving situations, like the one the officers were confronted with here after Mr. LaCruze struck multiple officers.  But they didn't confront the evidence offered by Mr. LaCruze, choosing instead to offer evidence of their version of what happened when officers were struggling to secure Mr. LaCruze, thereby leaving disputes of material fact that preclude summary judgment.

**C. Denial of Medical Care and Unconstitutional Conditions of Confinement After the April 17, 2020, Incident**

The parties dispute whether Mr. LaCruze required medical care and whether he was left in unconstitutional living conditions after he was restrained by officers in the gym. But Mr. LaCruze has presented no evidence that defendants Stamper, Jackson, Lunsford, Hammond, Walker, Zatecky, or Alsip had any interactions with or personal responsibility for Mr. LaCruze after he was restrained.

"For constitutional violations under § 1983 or *Bivens*, a government official is only liable for his or her own misconduct." *Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015) (cleaned up). Thus "[a] damages suit under § 1983 requires that a defendant be personally involved in the alleged constitutional deprivation." *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014); *see Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation.'").

Defendants Stamper and Lunsford were severely injured in the riot. Sgt. Lunsford was taken to the hospital and Ms. Stamper was granted one year of administrative leave after she received medical treatment for her injuries. Dkt. 98-8 at 2; dkt. 98-6 at 3. Defendant Hammond was sent home for a week to quarantine after the incident. Dkt. 98-9 at 2. Defendant Jackson testified that he had no further involvement with Mr. LaCruze after Mr. LaCruze was restrained. Dkt. 98-5. And there is no evidence in the record that defendants Walker, Zatecky, or Alsip had any involvement with or direct responsibility for Mr. LaCruze's treatment and housing assignment after the riot. Therefore, the

defendants are entitled to summary judgment on Mr. LaCruze's post-riot claims of deliberate indifference and unconstitutional conditions of confinement.

### D. State Law Indemnification Claim Against Defendant Zatecky

At screening, the Court allowed Mr. LaCruze to proceed on a state law claim against Warden Zatecky seeking indemnification. "In Indiana, a party may seek indemnification based on rights under statute, contract, or common law." *Land Innovators Co., L.P. v. Bogan*, 15 N.E.3d 23, 35 (Ind. Ct. App. 2014). Mr. LaCruze did not identify in his complaint any statute, contract, or common law that entitles him to indemnity. Nor has he identified any viable basis for this claim in summary judgment briefing. Therefore, defendant Zatecky is entitled to summary judgment.

### V.
### Conclusion

For the foregoing reasons, State Defendants' motion for summary judgment, dkt. [97], is **granted as to** his deliberate indifference and conditions of confinement claims, his excessive force claim against Sgt. Lunsford, his excessive force claim against Ms. Stamper for using OC spray on him, and his state law indemnification claim against Warden Zatecky. No partial summary judgment shall issue at this time. The **clerk is directed** to terminate Sgt. Lunsford, Warden Zatecky, Deputy Warden Alsip, and Sgt. Griffin as defendants on the docket.

The motion, dkt. [97], is **denied as to his** claims that defendants Stamper, Jackson, Walker, and Hammond used excessive force after he was taken down to the ground.

19

These claims will be resolved through jury trial or settlement. The Court reconsiders its previous denial of Mr. LaCruze's motion for counsel. Dkt. 85. The Court will attempt to recruit counsel to represent him through final judgment.

**SO ORDERED.**

Date: 9/27/2023

*James Patrick Hanlon*
_____
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

NICHOLAS LACRUZE
239236
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838

Carlton Wayne Anker
Lewis and Wilkins LLP
anker@lewisandwilkins.com

Douglass R. Bitner
Stoll Keenon Ogden PLLC
doug.bitner@skofirm.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com